James E. Cecchi
Michael A. Innes
CARELLA, BRYNE, CECCHI, OLSTEIN,
  BRODY & ANGELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

*Attorneys for Plaintiff and Proposed Classes*

*[Additional counsel appear on signature page.]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Township of Medford, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) Case No. |
| Plaintiff, | ) ) CLASS ACTION COMPLAINT ) <u>AND DEMAND FOR JURY</u> |
| vs. | ) ) ) |
| FIELDTURF USA INC., a Florida Corporation, FIELDTURF INC., a Canadian Corporation, TARKETT, INC., a Canadian Corporation, and FIELDTURF TARKETT SAS, a French Corporation, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

http

Plaintiff Township of Medford ("Plaintiff") hereby files this Class Action Complaint, on behalf of itself and all others similarly situated, against FieldTurf USA Inc. ("FieldTurf USA"), FieldTurf Inc., Tarkett, Inc., and FieldTurf Tarkett SAS ("Tarkett") (collectively, "FieldTurf" or "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.    This is a federal class action case involving a massive fraud committed by an industry giant against those least able to bear the cost.

2.    Between the early 2000's and 2012, FieldTurf – the leading manufacturer and seller of synthetic grass turf – knowingly sold synthetic grass turf fields containing a defective monofilament fiber (a component used in synthetic turf fields to form the grass-like fronds) (the "Evolution Fiber") to Plaintiff and hundreds of other U.S. consumers.

3.    The turf fields were sold under the various brand names, including "FieldTurf," "Durspine," "Duraspine Pro," "Prestige," "Evolution," "Tarkett," and "FieldTurf Tarkett" (herein after referred to collectively as, "Artificial Turf Fields").

4.      The Artificial Turf Fields were and are inherently defective due to the inferior and defective Evolution Fiber, a defect that also renders the long-term durability and promised performance of the fields impossible.

5.      Despite knowing that the Artificial Turf Fields were defective, FieldTurf marketed and sold its defective product with representations that they would last for more than ten years, and would not prematurely degrade.

6.      In addition, as if this were not enough, FieldTurf falsely represented that it used 10 pounds of infill – a mixture of sand and rubber granules – per square foot of the product when, in fact, FieldTurf used far less than 10 pounds per square foot of infill in the turf that it installed.  But FieldTurf nonetheless billed Plaintiff (and Plaintiff paid) for the materials and labor associated with the infill that Plaintiff did not receive.  On information and belief, the under-filling further increased the rate of premature degradation.  Further, FieldTurf knew that providing less than 10 pounds of infill per square foot created a harder surface that is more prone to cause serious injuries to athletes than a properly filled surface.  The under-filling increased the risk of, among other things, concussions, and injuries to shoulders and knees.

7.      Finally, FieldTurf falsely claimed that the safety studies cited in its marketing materials to show that the Artificial Turf Fields were safer than natural grass were "independent."  In truth, the studies were funded by FieldTurf.

8.    FieldTurf is a leading manufacturer and seller of synthetic grass turf, used in athletic fields, landscaping projects, golf courses, and more.  FieldTurf currently controls 85% of the United States market for synthetic turf fields. FieldTurf's principal consumers are the schools, towns, and local sports organizations across the country that buy and install FieldTurf's synthetic grass turf based on representations, and the reasonable belief, that it will outlast and outperform real grass turf and FieldTurf's competitors' synthetic grass, thereby saving them precious money over the duration of a field's lifespan.

9.    Indeed, FieldTurf's targeted marketing and advertising was specifically designed to establish that belief.  Its website fronts a "proven" reputation of trustworthiness and assures schools, towns, local sports organizations, and others that they will indeed see a return on their substantial investment because FieldTurf's product lasts longer and performs better than any other synthetic turf available. FieldTurf made these same promises regarding the defective Artificial Turf Fields at issue here.  FieldTurf sold its Artificial Turf Fields to Plaintiff and hundreds of other U.S. consumers from 2005 to 2012, all the while knowingly and actively concealing the damning truth: its purportedly "revolutionary" Artificial Turf Fields were made with a defective component material that nullified those representations and promises.

10.    From 2005 through 2012, FieldTurf exclusively purchased, and manufactured its Artificial Turf Fields with the Evolution Fiber supplied by Mattex

Leisure Industries ("Mattex"), an entity later acquired by TenCate Thiolon Middle East, LLC ("TenCate").

11.     Even before FieldTurf entered into its first exclusive supply agreement with Mattex in November 2005, FieldTurf employees were aware that the Evolution Fiber was not properly functioning, not meeting the durability and performance qualities FieldTurf itself tested for, and questioned whether it was the right fiber to use in FieldTurf's product.

12.     Nevertheless, in 2005 FieldTurf aggressively launched a national marketing campaign that touted its Artificial Turf Fields' durability and performance, based on the Evolution Fiber.  It claimed the Artificial Turf Fields offered extreme performance, unmatched durability, and a ten-plus year lifespan with low maintenance and the potential to save millions of dollars in back-end costs.  Consumers, including schools, towns, local sporting organizations, and others, relied on those representations and paid high premiums when purchasing the Artificial Turf Fields as a result.  And sales skyrocketed.

13.     By 2006, FieldTurf had irrefutable evidence that its Artificial Turf Fields were not living up to its claims.  In fact, it knew that fields it installed in 2005 and 2006 had already begun to rapidly deteriorate.  Internal company documents demonstrate that officials at FieldTurf considered the deterioration to be a crisis that could cost the company hundreds of millions in warranty claims and replacements.

Between 2006 and the time in 2012 when FieldTurf finally discontinued selling the Artificial Turf Fields, the evidence mounted that the fields could not maintain performance or durability anywhere close to the ten-plus years promised.

14.    In 2010, FieldTurf's own testing confirmed that the premature deterioration of its Artificial Turf Fields was due to the inferior chemical composition of the Evolution Fiber that was used to manufacture the fields.

15.    Rather than inform past or potential purchasers of the defective Evolution Fiber and the threat of premature deterioration of the Artificial Turf Fields, *at any point in time*, FieldTurf simply leaned into its marketing campaigns, pushing durability, safety, performance, and a ten-plus year lifespan, while pocketing the revenue from its sale of Artificial Turf Fields that it knew contained the defective Evolution Fiber.

16.    FieldTurf intentionally and knowingly misled consumers through outright deception and the omission of material facts that, if known by consumers, would have assuredly had a significant impact on its bottom line.  Indeed, FieldTurf's fraud had a devastating negative impact on the bottom line of the Plaintiff and other consumers that spent upwards of a combined $570 million to purchase a product that was promised to have a ten-plus year lifespan.

17.    In December 2016, NJ Advance Media finally began to expose FieldTurf's fraudulent scheme,[1] publishing the results and details of an exhaustive six-month investigation into FieldTurf and the prematurely deteriorating Artificial Turf Fields.

18.    FieldTurf's consumers are left dealing with the fall out of their defective Artificial Turf Fields.  Plaintiff has filed this class action lawsuit to mitigate that fall out and restore consumers by seeking all legal and equitable relief available under applicable statutory and common law.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because this action is between citizens of different states, there are more than 100 Class members (defined below), and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

20.    Venue is proper in this District under 28 U.S.C. §1391.  Defendants conduct business in New Jersey, receive substantial compensation and profits from the sale of its Artificial Turf Fields in this District, all of which contained the defective Evolution Fiber, and have made material omissions and misrepresentations and breached contracts and other promises and engaged in unlawful practices in this

---

[1]    *See* Christopher Baxter & Matthew Stanmyre, *The Hundred Yard Deception*, NJ ADVANCE MEDIA, https://readymag.com/njdotcom/fieldturf/2/ (last visited June 12, 2017).

District, so as to subject themselves to personal jurisdiction in this District. Further, Plaintiff is physically located and operates its business in this District, and Defendants installed the Artificial Turf Fields on Plaintiff's property in this District.

21.    Venue in this District is also proper as to the Canadian and French FieldTurf entities because they are not residents of the U.S., and are otherwise subject to personal jurisdiction in this District.

22.    This Court has personal jurisdiction over Defendants because, as further described herein, Defendants engage in substantial business in New Jersey, including in this District, and/or have consented to personal jurisdiction in this District, Defendants directed the defective Artificial Turf Fields to this District, and a substantial portion of the wrongdoing alleged took place in this District.

## PARTIES

**Plaintiff**

23.    Plaintiff Township of Medford is located in Burlington County, New Jersey. Plaintiff purchased a defective Artificial Turf Field from Defendants in 2006.

**Defendants**

24.    Defendant FieldTurf USA Inc. is a Florida corporation with its principal place of business located at 75 North Industrial Blvd., N.E., Calhoun, Georgia 30701. FieldTurf USA markets, manufactures, sells and installs the defective Artificial Turf Fields in New Jersey and throughout the United States.

- 7 -

25.    Defendant FieldTurf Inc. is a Canadian corporation with its principal place of business located at 8088 Montview Road, Montreal, Quebec, H4P 2L7. Upon information and belief, FieldTurf Inc. manufactures, sells and installs defective Artificial Turf Fields or otherwise conducts business in the United States, including New Jersey.

26.    Defendant Tarkett, Inc. is a Canadian corporation with its principal place of business located at 8088 Montview Road, Montreal, Quebec, H4P 2L7.  Upon information and belief, Tarkett, Inc. manufactures, sells and installs defective Artificial Turf Fields or otherwise conducts business in the United States, including New Jersey.

27.    Defendant FieldTurf Tarkett is a French corporation with its principal place of business located at 2 Rue de l'Egalite, 92748 Nanterre Cedex, France.  Upon information and belief, FieldTurf Tarkett is the parent corporation to FieldTurf USA and was actively involved in concealing the defect from United States consumers.

## FACTUAL ALLEGATIONS

**FieldTurf Today: A Reputation Built on Lies**

28.    FieldTurf touts itself as the "world leader in artificial turf."  According to NJ Advance Media, "[t]he research group IBIS World said last year that the highly competitive U.S. artificial turf installation industry generates about $1.2 billion annually, and that Field Turf and its parent company, Tarkett, hold the largest market

share."[2]   As of the filing of this Complaint, FieldTurf has installed over 7,000 synthetic sports fields globally,[3] including 1,428 in the United States between 2005 and 2012 alone, 164 of which are installed in New Jersey.[4]

29.    Prominently displayed on the banner page of FieldTurf's website is FieldTurf's claim that it is the most trusted brand in the industry ostensibly due to its Artificial Turf Fields' combination of safety, performance, and durability:

> When it comes to artificial turf sports fields, FieldTurf is the most trusted brand in the industry. Whether its football, soccer, baseball or any other sport, our turf fields will provide your athletes with the safety and performance they need to perform at their best, while giving field owners the durability they want to maximize the value of their investment.[5]

30.    Indeed, FieldTurf's marketing materials claim that two "independent" scientific studies show that Artificial Turf Fields are "safer than natural grass."

31.    Neither of these studies, however, is "independent."

32.    Both were funded by FieldTurf.

33.    Moreover, studies that are, in fact, free of industry bias have reached a different conclusion regarding the safety of FieldTurf as compared to natural grass.

---

[2]   *Id.*

[3]   *Home*, FIELDTURF, http://www.fieldturf.com/en/home (last visited June 12, 2017).

[4]   Christopher Baxter & Matthew Stanmyre, NJ ADVANCE MEDIA (Dec. 10, 2016), *Authorities in N.Y., N.J. Examining Conduct of Top U.S. Turf Company*, http://www.nj.com/news/index.ssf/2016/12/authorities_in_ny_nj_examining_conduct _of_top_us_t.html.

[5]   FIELDTURF, *supra* n.3.

34.     The first study cited in FieldTurf's marketing materials, "Incidence, Causes, and Severity of High School Football Injuries On FieldTurf Versus Natural Grass," was authored by Bill S. Barnhill, M.D., and Michael C. Meyers, Ph.D. and published in August 2004 in the American Journal of Sports Medicine (hereinafter referred to as the "2004 Study").

35.     The second study cited in FieldTurf's marketing materials, "Incidence, Mechanisms, and Severity of Game-Related College Football Injuries on FieldTurf Versus Natural Grass – a 3-Year Prospective Study," was authored solely by Michael C. Meyers, Ph.D. and published in the American Journal of Sports Medicine in 2010 (hereinafter the "2010 Study").

36.     In 2013, Dr. John Orchard published a paper in the British Journal of Sports Medicine alleging that both the 2004 Study and the 2010 Study were funded by FieldTurf and, therefore, were not "independent."

37.     In that same article, Dr. Orchard cites several studies that are "independent of industry funding," including one that "[e]xamined anterior cruciate ligament (ACL) and other lower limb injury rates in the NFL on FieldTurf compared to natural grass; the rate on FieldTurf were significantly higher."[6]

---

[6]   John Orchard, *Research on products such as artificial turf is potentially exposed to the same types of industry bias as research on pharmaceuticals.*, BR. J. SPORTS MED 2013; 47:725-726 (June 22, 2013).

38.     FieldTurf further holds itself out as the "company that changed the industry," whose reach extends not only to major sports teams, but to municipalities, schools, like Plaintiff, and other small organizations across the United States:

> Cities and schools have been benefitting from our ability to provide the very best value for the short and long term, allowing organizations at all levels to be able to forecast the amount of money they will save by installing FieldTurf, the safe, long-lasting and high performing artificial turf system.[7]

39.     While FieldTurf admits that its synthetic grass fields come at a high price premium on the front end, it justifies those prices with claims that consumers will save money over the life of the product: "The upfront cost is higher, but the cost savings over time make it a much more financially-sound decision."[8]

40.     As detailed herein, FieldTurf falsely made these same claims from 2005 through 2012 regarding the Artificial Turf Fields at issue in this Complaint, while omitting material facts that directly precluded any possibility consumers would indeed receive the promised return on their investment.

41.     In fact, FieldTurf established its dominance in the synthetic grass fields market, in terms of both aggregate sales dollars and the number fields installed, on the backs of defrauded tax payers and consumers.  Indeed, to this day FieldTurf boasts

---

[7]     *The Company*, FIELDTURF, http://www.fieldturf.com/es/artificial-turf/about-fieldturf (last visited June 12, 2017).

[8]     *Cost Analysis*, FIELDTURF, http://www.fieldturf.com/es/fieldturf-difference/cost-analysis (last visited June 12, 2017).

that it has "more fields that have lasted 10, 11, 12 or even 13 years than all than all of [their] competitors combined,"[9] but nowhere does it disclose that those fields were and are inherently defective due to an inferior and defective component material that renders the long-term durability and promised performance of those fields impossible. Instead, FieldTurf maintains that it "has proven to be the most durable and longest-lasting synthetic turf system in the marketplace."[10]

**The Artificial Turf Evolution**

42.    Artificial turf has been available since 1965.[11]  However, according to FieldTurf's website, even though natural grass required constant maintenance and could not withstand heavy use, it was considered by many to be the best solution for sports fields around the world prior to FieldTurf's own revolutionary design for artificial turf fields in the early 1990's.[12]

---

[9]    *FAQ*, FIELDTURF, http://www.fieldturf.com/en/artificial-turf/faq (last visited June 12, 2017).

[10]    "FieldTurf launches 'FieldCare' national maintenance program, marks another industry first," FIELDTURF, http://www.fieldturf.com/es/artificial-turf/artificial-turf-news/fieldturf-launches-fieldcare-national-maintenance-program-marks-another-ind (last visited June 12, 2017).

[11]    *Brief History of Synthetic Turf, The roots of synthetic grass.*    TENCATE, http://www.tencate.com/amer/grass/synthetic-turf-101/request-a-presentation/default.aspx (last visited June 12, 2017).

[12]    FIELDTURF, *supra* n.6.

43.     Former professional athletes John Gilman ("Gilman") and Jean Provost founded FieldTurf in 1994 to design and sell a new artificial turf that allegedly would be safer for athletes than the then existing artificial turf fields[13] and "provide . . . high performance and extreme durability."[14] Specifically, they claimed to design a system of turf that more closely resembled natural grass by using individual synthetic grass fibers that are surrounded and stabilized by FieldTurf's patented mixture of sand and rubber granules, or "infill," rather than the shock pad used in more traditional systems. Prior to installation, the synthetic grass fibers that make up FieldTurf's design are stitched or "tufted" into a permeable backing material in rows according to a spacing formula that allegedly enables cleats to penetrate the infill material rather than the fiber on the surface of the field.  This spacing formula is claimed to provide traction and prevent player injuries.

44.     FieldTurf knew that its new "infill" and "tufts" design alone could not assure the "high performance and extreme durability" it promised.  In fact, FieldTurf understood, at all times, that the durability and performance of FieldTurf's Artificial Turf Fields is and was intimately tied to the nature and properties of the fiber itself, including the fiber's component materials and the extrusion method used to

---

[13]  *FieldTurf USA Inc. v. TenCate Thiolon Middle East E., LLC,* No. 11-0050 (TWT) (N.D. Ga. Mar. 1, 2011), Complaint at ¶22 [Dkt. No. 1].

[14]  FIELDTURF, *supra* n.6.

manufacture it. As explained below, FieldTurf placed great weight on the chemical composition of the fiber, as well as its method of extrusion, and FieldTurf deemed the component synthetic fiber properties to be the key factors affecting the long-term durability and performance of its finished Artificial Turf Fields.

45.    Traditionally, synthetic fibers used in artificial grass field systems have taken one of two forms: slit-film tape or monofilaments. Both are extruded from a melted polymer mixed with a blend of other chemicals, known as a "Masterbatch," which plays a key role in determining the finished fibers' durability, including its fade-resistance and ability to withstand ultraviolet radiation. Slit-film tape fibers are extruded into flat sheets that are approximately five feet wide and then cut into a predetermined width and perforated by design. Monofilament fibers are made of the same basic polymer but extruded as spaghetti-like strands, rather than flat sheets.[15]

46.    For some time prior to 2004, FieldTurf built its artificial turf systems using slit-film tape, which had long-term durability issues due largely to the way in which it was manufactured and installed. During manufacturing, slit-film tape is mechanically cut into individual tapes from the original sheet of melted polymer, which are then cut again so that they have "slits" approximately 0.05 inches apart. The tape is then twisted, tufted into the fabric backing, and coated with polyurethane.

---

[15]    Paul Steinbach, *Synthetic Turf Fields Benefitting from Latest Fiber Technology*, ATHLETIC BUS. (Feb. 2011), http://www.athleticbusiness.com/Outdoor/synthetic-turf-fields-benefitting-from-latest-fiber-technology.html.

During slit-film installation, the perforations are combed through repeatedly, or "fibrillated," to form the individual filaments that will comprise the finished playing surface. This equates to a fiber that is repeatedly split and fibrillated during both manufacture and installation, ostensibly for a real world grass feel and look; this repeated splitting and fibrillation inherently compromises the integrity and durability of the finished artificial turf product.

47.    A number of fiber manufacturers, including Mattex and TenCate, developed and manufactured monofilament fiber in response to the need for a fiber that was a more durable alternative to slit-film tape.

48.    As noted above, while monofilament fiber is made from the same basic "melted polymer plus Masterbatch formula" as slit-film tape, its extrusion process is markedly different. Rather than a flat five feet wide sheet, the extrusion process for microfilament pushes the melted polymer through a "spinneret," which is a multi-pored device designed to shape each individual fiber, resulting in individual strands of fiber rather than a flat sheet. No further splitting or cutting is necessary, reducing manufacturing-based premature fiber destruction. The individual strands are then wrapped together with a wrap yarn and passed through a machine for tufting. Once tufted, the monofilament fiber does not need to be fibrillated or untwisted prior to installation, thereby reducing installation-based causes of premature fiber destruction.

When manufactured *correctly*, the result, purportedly, is a more durable finished product.

49.     However, the microfilament extrusion process carries its own risks to durability, and both the polymer and Masterbatch blends vary between manufacturers—differences which can lead to a pronounced impact on fiber durability and performance.  The extrusion of monofilament polyethylene fiber is a highly technical process, which requires significant expertise and precise control of temperature and pressure levels.  Small changes in extrusion settings (*e.g.*, line speed, capillary throughput, or head pressure) can dramatically impact a fiber's mechanical durability and resilience.  Further, if pressure and temperature are not kept under control, meaningful damage can be done to the ultraviolet ("UV") stabilizer packages that are added to proprietary Masterbatch formulas.  Adequate UV protection is crucial to any fiber's long-term durability and ensures that the extruded polymer fibers are able to withstand long-term exposure to UV radiation, *i.e.*, sunlight.  If a fiber is not provided with UV stabilizers of an adequate quality or amount, it will fade, split, and break down as it is exposed to the sun's rays over time.

50.     Early versions of these microfilament fibers had very thin, flat blades that were prickly to touch, and as such, they were used primarily in landscape projects.  In 2003, Mattex introduced the Evolution Fiber, which had a "U" shape containing a curved spine with wings, and which created a softer, more grass-like texture.

51.    FieldTurf's co-founder, Gilman, first learned about Mattex's new monofilament fiber at an industry show in November 2003.  FieldTurf placed an initial order for Evolution Fiber and invited Mattex's Managing Director, Jeroen van Balen ("van Balen"), to FieldTurf's office in Montreal, Canada to discuss the new fiber.

52.    In 2004, FieldTurf requested to, and did, examine the results of Mattex's UV stability testing, which evaluated the Evolution Fiber's durability, tensile strength, and colorfastness under prolonged UV exposure.  FieldTurf also outsourced its own series of tests to examine the UV stability and durability of the Evolution Fiber. Finally, FieldTurf conducted in-house accelerated wear testing on turf samples constructed with Evolution Fiber, or "Mad Max" testing, to test for premature wear, *i.e.* in the form of fibrillation or splitting.[16]

53.    FieldTurf insisted on reviewing and conducting the preliminary testing going to UV stability and accelerated wear because it knew, well before entering into any agreement with Mattex for the Evolution Fiber, that chemical composition was a key factor in the fiber's ability to outlast and outperform, and therefore key to FieldTurf's ability to maintain its marketing claims regarding unmatched durability, extreme performance, and a long lifespan.  In particular, FieldTurf understood, prior

---

[16]    *TenCate* Complaint at ¶49.

to entering any agreement with Mattex, that UV degradation was a major potential cause of premature deterioration in synthetic fibers.

54.    FieldTurf and Mattex ultimately signed and entered into an exclusive supply agreement for the Evolution Fiber on September 10, 2005 ("2005 Supply Agreement").

55.    On November 29, 2006, FieldTurf and Mattex entered into another exclusive supply agreement for the Evolution Fiber, which was extended through subsequent amendments ("2006 Supply Agreement").

56.    On July 1, 2008, FieldTurf entered into a new two and one-half year supply agreement with TenCate, whose parent company had acquired Mattex on February 12, 2007 ("2008 Supply Agreement").  Upon information and belief, at all times material herein, Mattex and/or TenCate were the exclusive suppliers of the Evolution Fiber.

57.    All Artificial Turf Fields manufactured and sold by FieldTurf between 2005 and 2012 were constructed with the defective Evolution Fiber.

58.    FieldTurf had ample evidence, even before it signed its first contract with Mattex, that the Evolution Fiber did not meet the durability and UV standards FieldTurf knew were needed for its intended product.  Certainly, by the time FieldTurf signed the 2006 Supply Agreement and the 2008 Supply Agreement with Mattex and/or TenCate, FieldTurf knew that the Evolution Fiber was defective and, as such,

knew that its Artificial Turf Fields could not live up to its marketing claims or consumers' expectations.

**FieldTurf Dominates the Artificial Turf Market**

59.    Beginning in 2005 and continuing through 2012, FieldTurf manufactured, marketed, sold, and installed its Artificial Turf Fields with Evolution in 2005 under the brand names "FieldTurf," "Duraspine," "Duraspine Pro," "Prestige," "Evolution," "Tarkett," and "FieldTurf Tarkett."

60.    FieldTurf's Artificial Turf Fields were the most expensive on the market. The average price for an Artificial Turf Field was between $300,000 and $500,000, with some consumers paying more than $1 million for construction and installation. A typical field averaged about an $85,000 premium or approximately about $1 per square foot more than the competition.[17]

61.    FieldTurf justified this high cost by promising consumers its Artificial Turf Fields were more durable with better performance and a longer useable life than its competitors.  For example:

        (a)    FieldTurf's marketing showcased high-profile, real world clients, such as the New England Patriots, to convince consumers by way of example that its Artificial Turf Fields were indeed worth the investment due to a longer lifespan;

---

[17]    *Baxter*, *supra* n.1.

(b)     FieldTurf claimed in its marketing materials that the Artificial Turf Fields had "unmatched durability" and were "far more resistant to UV and foot traffic";[18]

(c)     In a trade publication article in 2006, FieldTurf's CEO Gilman said, "[w]e anticipate that a mono surface will have a useful life longer than the 10 years we expect from a tape filament surface";[19]

(d)     FieldTurf wrote in a brochure for the Artificial Turf Fields that their prior iteration, the slit-film fields, "have been in the ground for over 10 years of consistent play, season after season" and that the Artificial Turf Fields "are expected to last even longer due to the obvious increase in durability of our built-in fiber properties";[20]

(e)     A typical FieldTurf pitch from 2005 – 2012 claimed its Artificial Turf Fields "would virtually eliminate the maintenance costs associated with natural grass and could be used 12 months a year, dawn to dusk and under the lights."  It continued, "[t]hese fields would also last far longer than competitor turfs and even FieldTurf's previous products";[21]

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

(f)     Another typical marketing pitch claimed, "[t]his added longevity will actually allow the district to amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy";[22] and

(g)     FieldTurf bolstered these claims of extreme performance and unmatched durability with an eight-year manufacturer's warranty with the reassurance that the fields would indeed last ten years or more with little maintenance.  As of the date of filing this Complaint, FieldTurf's website advertises a similar, if not identical, warranty:

> And while you'll probably never need to use it, you can rest assured that you're protected by the industry's best warranty in the unlikely event something goes wrong with your artificial turf system.[23]

62.     These claims were a key differentiator between FieldTurf's Artificial Turf Fields and other manufacturers' synthetic grass products.  Indeed, FieldTurf's promises of performance, safety, durability, and an enhanced lifespan were the primary reason consumers purchased and installed the Artificial Turf Fields at a steep price premium.

63.     Throughout its marketing of the Artificial Turf Fields, FieldTurf knowingly concealed the product's defects, as well as the falsity of the representations

---

[22]   *Id.*

[23]   *Insured    Warranty*, FIELDTURF,    http://www.fieldturf.com/en/fieldturf-difference/insured-warranty (last visited June 12, 2017)

that the product had an expected lifespan of more than 10-years. FieldTurf concealed all of this with the intention that consumers would rely on the false and misleading claims.

64.    Marketing efforts were a success and sales skyrocketed, especially to schools and towns in New Jersey and across the country, mostly at tax payer expense—so much so that "architects for schools and towns began writing public bid specifications requiring monofilament fields, and sometimes demanding FieldTurf."[24] Court records shows that many town and school officials "relied on and used warranties and FieldTurf's claims about fields lasting 10-plus years to win over skeptical residents worried about the price tag." *Id.*

65.    According to Troy Squires, FieldTurf's Senior Vice President for Sales and Marketing from 2004 to 2009: "Sales probably almost doubled in a few years . . . Very high margins, high prices, and it was very successful."

66.    Indeed, the numbers[25] speak for themselves. Upon information and belief:

        (a)    In 2006, FieldTurf sold 168 Artificial Turf Fields nationally, including about 14 in New Jersey, for an estimated $67 million;

---

[24]    *Baxter*, *supra* n.1.

[25]    Sales and revenue figures quoted from *Baxter*, *supra* n.1.

(b)    In 2007, FieldTurf sold 317 Artificial Turf Fields nationally, including about 37 in New Jersey, for an estimated $127 million;

(c)    In 2008, FieldTurf sold 419 Artificial Turf Fields nationally, including about 43 in New Jersey, for an estimated $168 million;

(d)    In 2009, FieldTurf sold at least 307 Artificial Turf Fields nationally; and

(e)    In 2010, FieldTurf sold at least 164 Artificial Turf Fields nationally.

(f)    In total, FieldTurf earned approximately $572 million through the sale of nearly 1,500 fields from 2005 through 2012, the year it discontinued the sale of the Artificial Turf Fields at issue in this Complaint.

67.    As explained in more detail below, each of the Artificial Turf Fields that FieldTurf marketed, sold, manufactured, and/or installed were made with the same defective Evolution Fiber, rendering the fields themselves defective and causing significant premature deterioration, a shorter than promised lifespan, and significantly sub-par performance.

**Discovery and Omission of Truth Regarding Defective Evolution Fiber**

68.    As has only recently been revealed, beginning in the early 2000's FieldTurf knew that its Artificial Turf Fields could not possibly meet the unmatched durability, safety, and superior performance claims it made in its uniform marketing

campaign to consumers in New Jersey and across the country, and from the time it started manufacturing, marketing, selling, and installing those fields until the year it discontinued them, FieldTurf concealed a major material truth – the Artificial Turf Fields were made with defective Evolution Fiber that offered poor UV protection and were prone to premature deterioration, fraying, fading, matting, and fibrillating years before their promised lifespan.

69.    In fact, by early 2005, Derek Bearden, FieldTurf USA's then-Vice President of Manufacturing at its plant in Dalton, Georgia had already noticed a drop in the performance of the Evolution Fiber under Mad Max testing, a test FieldTurf designed to simulate foot traffic on turf samples and assess how many cycles the sample can withstand before showing fibrillation or splitting, as compared to the Evolution Fiber FieldTurf had first inspected in 2003 and 2004.[26]

70.    Additionally, Bonar Yarns, another of FieldTurf's suppliers, warned FieldTurf in May 2005 that its own testing of the defective Evolution Fiber showed it "did not stand up well to wear and tear."   Gilman emailed his director of manufacturing that month, asking: "Is it possible that we erred in our over exuberance in the adoption of the monofilament yarns, specifically the Mattex [Evolution Fiber] yarns?"[27]

---

[26]  *TenCate* Complaint at ¶52.

[27]  *Baxter*, *supra* n.1.

71.    In October 2006, FieldTurf's operations director for Latin America, Laura Braga, emailed CEO Gilman and executive director Ken Gilman ("K. Gilman") to express her concern regarding premature deterioration in some of the earliest Artificial Turf Fields, which had been installed in high UV radiation areas in South America: "The corner kick and goal mouth areas are showing premature wear in both the small fields and the big fields."  According to NJ Advance Media, "Braga said the Chileans had reported FieldTurf's first South American field, a slit-film built in 2003, was in better condition than the less-than-1-year-old" Artificial Turf Fields using Evolution.[28]  On December 28, 2006, Gilman emailed van Balen at Mattex, writing "We are seeing fields showing splitting after under a year of play and have already had to replace one full-size field due to yarn failure after only a few months of installation!"[29]

72.    From at least October 2006 forward, FieldTurf, including its top executives, knew full-well that its Artificial Turf Fields were prematurely deteriorating and becoming matted shortly after installation and that FieldTurf chose to conceal that problem from the buying public, despite internal protestations from concerned employees.

---

[28]  *Id.*

[29]  *Id.*

73.     In July 2007, K. Gilman arranged a trip to New Jersey with FieldTurf's interim CEO from 2007-2008, David Moszkowski ("Moszkowski"), and other executives to demonstrate and bring them up to speed on the problems that had been occurring in fields installed in the state.  K. Gilman summarized their observations of Evolution's premature deterioration, fading, and matting in an email to the group and Darren Gill ("Gill"), the Director of Marketing, explaining: "This yarn is nowhere near as robust or resilient as we initially thought and probably will not last that much longer than a high quality slit-film yarn . . . . In all likelihood in years 5 and 6 these Duraspine fields will be matted down and fibrillating pretty heavily. . . . Our marketing claims and sales pitches need to reflect this reality."[30]

74.     In November 2007, K. Gilman sent an email to Moszkowski and FieldTurf's Vice President of Operations from 2000 to 2008, Kevin Reynolds ("Reynolds"), writing emphatically: "This opens us up to tons of exposure from a legal standpoint," K. Gilman wrote. "The claims made regarding the Duraspine … fiber are ridiculous. Every day we are putting stuff out there that can't and won't live up to the marketing spin.  We have to control this somehow!!!"[31]

75.     In February 2008, K. Gilman emailed Moszkowski and others, writing: "I don't want to beat a dead horse but I think this issue (field 'failure', monofilament

---

[30]   *Id.*

[31]   *Id.*

layover, et cetera …) is extremely important and requires further analysis and discussion . . . Duraspine is not all that it's cracked up to be especially in terms of wear resistance."[32]

76.    In 2008, on the same day that yet another CEO, Joe Fields ("Fields"), took the helm, K. Gilman again implored senior management to respond to the growing crisis.  Analyzing FieldTurf's failures, K. Gilman wrote: "Irresponsible sales and marketing claims are made continuously that the product simply cannot possibly technically deliver on . . . . This sets us up for future claims, unhappy consumers, lawsuits, etc."[33]    Despite K. Gilman's continuing protestations and customer complaints, FieldTurf entered into another exclusive supply agreement with TenCate and continued selling the Artificial Turf Fields until 2012.

77.    Over the course of 2009 and 2010, FieldTurf received complaints from a significant number of consumers in North America who had purchased the Artificial Turf Fields, all of which contained the defective Evolution Fiber.  Each complaint pointed to the same premature degradation of the fibers, resulting in splitting and shedding during routine use, as well as excessive thinning and fading.

78.    FieldTurf representatives, including Howard McNeil (Senior Vice President of Operations) and Brian Waters (Director of Logistic and Purchasing),

---

[32]  *Id.*

[33]  *Id.*

reported customer complaints to TenCate representatives, and in mid-2010, McNeil and Waters established weekly telephone conferences and monthly in-person meetings to address the quality and production issues associated with the Evolution Fiber.[34]

79.    In 2010, FieldTurf also conducted its own independent investigation of the Evolution Fiber and confirmed what it had already known to be true since 2006: the Evolution Fiber was defective.  Specifically, FieldTurf tests showed that the premature deterioration in its Artificial Turf Fields was caused by a combination of inadequate UV protection and a sub-standard polymer in the Evolution Fiber's chemical composition.

80.    Then they sued.  In 2011, FieldTurf brought suit against Mattex and TenCate for fraudulent inducement, among other things, alleging that the Evolution Fiber Mattex/TenCate supplied to them under the 2005 Supply Agreement, the 2006 Supply Agreement, and the 2008 Supply Agreement were indeed defective from the first shipment through the last.

81.    And yet, during this entire period of time, and despite customer complaints and internal employee warnings, its own internal investigation and its lawsuit against its third party supplier, never once did FieldTurf modify its marketing campaigns or disclose the defective Evolution Fiber and the true nature of the Artificial Turf Fields to anyone – not potential consumers, not past purchasers, not

---

[34]    *TenCate* Complaint at ¶¶87-88.

consumers who complained of premature deterioration, both inside and outside of the eight-year warranty period, and certainly not public authorities.

82.    Instead, as it did for so many years prior to bringing the suit, FieldTurf kept on manufacturing, marketing, selling, and installing the very product it knew to be defective, using the same marketing claims about unmatched durability, extreme performance, and a ten plus year lifespan, and further, concealing material information that made those claims suspect, if not downright impossible to meet.

83.    In an industry without set standards, consumers relied on FieldTurf's claims and assurances that the Artificial Turf Fields were performing as they should and that they would and could live up to the consistent, unwavering, marketing hype promising extreme performance, unmatched durability, and a ten plus year lifespan.

84.    FieldTurf's current Vice President of Marketing, Innovation and Customer Service, Gill, flatly stated in a 2012 deposition that marketing materials for the Artificial Turf Fields were never changed to reflect the true impact of the defective Evolution Fiber because "[he] wasn't asked to change them."[35]  Period. End of story.

85.    Reynolds summarized FieldTurf's outrageous actions and response to the defective Evolution Fiber in an interview: "You can't stick your head in the sand and say this isn't a major problem, not a major issue, let's just keep going . . . You have to

---

[35]  *Baxter*, *supra* n.1.

make the necessary adjustments based on what you're seeing, and the company never did that."[36]

86.     But, FieldTurf did stick its head in the sand, concealing the problem, marketing and installing fields known to contain the defective Evolution Fiber, never notifying consumers or attempting to make them whole, and never modifying its marketing campaigns and representations accordingly.  Indeed, it left consumers in the dark and kept pocketing revenue from sales of Artificial Turf Fields that it knew were made with a defective fiber and incapable of delivering on FieldTurf's extreme and fallacious marketing claims.

**The Truth Begins to Be Revealed**

87.     In December 2016, NJ Advance Media published the shocking results of its thorough and searching investigation into the Artificial Turf Fields, the defective Evolution Fiber, and Defendants' elaborate and well-concealed fraud.[37]  Indeed, it took NJ Advance Media six months of in-depth investigation, analyzing 5,000 pages of production from 40 document requests, interviewing dozens of coaches, officials, and current and former FieldTurf employees, examining 50 fields in New Jersey, and commissioning the services of an independent testing laboratory the University of

---

[36]  *Id*.

[37]  *Id*.

Michigan's Breaker Space Lab to test turf fibers from three locations containing the Artificial Turf Fields in New Jersey to uncover the breadth of the fraudulent scheme.

**Plaintiff Township of Medford**

88.    In or about 2006, Plaintiff sought bids for a synthetic grass field to replace an existing natural grass field.

89.    Plaintiff ultimately selected a bid submitted by Landtek, a company working with FieldTurf.

90.    After the bid was accepted, FieldTurf recommended that Plaintiff "upgrade" the artificial turf to be installed to one of FieldTurf's Artificial Turf Fields at a higher price point than the turf identified in the winning bid.

91.    FieldTurf represented to Plaintiff, both verbally and in marketing materials, that the product was a superior overall as it boasted, among other things, greater longevity, durability, and safety features than the original product offered in the bidding process, as well as those offered by competitors.  Plaintiff relied upon this representation, which became part of the basis of the bargain between FieldTurf and Plaintiff.

92.    FieldTurf also represented to Plaintiff, both verbally and in marketing materials, that the expected useful life of the Artificial Turf Field was greater than ten years.  Plaintiff relied upon this representation, which became part of the basis of the bargain between FieldTurf and the Plaintiff.

93.    FieldTurf represented to Plaintiff, both verbally and in marketing materials, that based on "independent" scientific studies the Artificial Turf Field was "safer than natural grass."  Plaintiff relied upon this representation, which became part of the basis of the bargain between FieldTurf and Plaintiff.

94.    In or about 2006, Plaintiff entered into a contract with Landtek, as an agent of FieldTurf, to install an Artificial Turf Fields for payment of approximately $660,000.00.

95.    FieldTurf expressly warranted that the goods and services furnished to Plaintiff would be merchantable, fit for their intended purpose, free from all defects in materials and workmanship, and free from defects in design.

96.    FieldTurf supplied and installed a defective Artificial Turf Field in or about 2007.

97.    The Artificial Turf Field is located at Bob Bende Park, 291 Medford-Mt. Holly Road, Medford, NJ 08055-9516, and is commonly referred to as "Soccer Field No. 2."

98.    As early as 2011, the grass-like fronds on Soccer Field No. 2 began fading, thinning, tearing out, and shedding.  In addition, the seams began to tear.

99.    On average, Soccer Field No. 2 was closed two to three weeks during the usable season every year so that maintenance crews could attempt to repair the

dangerous conditions resulting from the defective Artificial Turf Field and/or the under-filling.

100.   Ultimately, it became clear that the defects in the Artificial Turf Field would render it unsafe and, as such, Plaintiff sought bids to replace the defective Artificial Turf Field.

101.   In or about 2016, Plaintiff installed a replacement field at its own expense with a competitor's product. The cost of replacement was over $450,000.00.

**Total Damages and Impact**

102.   Today, FieldTurf officials concede that it has replaced nearly one of every five, or approximately 20 percent of, outdoor Artificial Turf Fields that it sold between 2005 and 2012. However, that number is but a small reflection of the true impact this fraudulent scheme had, and continues to have, on schools, towns, and others.

103.   Upon information and belief, FieldTurf made these replacements with the same synthetic grass, containing the same defective Evolution Fiber, without any extension of warranty, without disclosing the lawsuit against its supplier, and without informing consumers that the replacement would likely perform no better than the field being replaced. When asked in 2014 if FieldTurf told consumers the Evolution

Fiber was defective, FieldTurf President Eric Daliere testified: "Not in those words."[38]

104.    When consumers reported or questioned the premature deterioration, FieldTurf falsely reassured consumers that its Artificial Turf Fields were performing as they should and that the deterioration was part of normal wear and tear. Due to the lack of industry standards by which to compare performance, consumers had no way of knowing the statements were untrue. They relied on FieldTurf's false assurances, to their detriment. Indeed, Charles Cook, FieldTurf's Vice President of Construction and Installations for North America, testified that the deterioration was not part of the normal aging process: "On other fibers, other fields, other products, we just don't see this type of fracturing, shedding, breaking, releasing of fibrils."[39]

105.    Upon information and belief, FieldTurf wrongfully denied an untold number of valid warranty claims or delayed curing the reported defect for years, running out the clock on its eight-year warranty.

106.    Upon information and belief, the costs of replacement, even under warranty, can be and often are significant. When FieldTurf did agree to replace the defective Artificial Turf Fields, it charged a premium of hundreds of thousands of dollars.

---

[38]    *Baxter*, *supra* n.1.

[39]    *Id.*

107. Still, FieldTurf has not yet told the majority of its consumers about the defective Evolution Fiber and the premature deterioration and sub-par performance it causes in the Artificial Turf Fields.

108. At bottom, FieldTurf promised unmatched durability, extreme performance, and a ten plus year lifespan. It delivered consumers a product that came nowhere near close to meeting those promises, and those consumers still do not have fields of the quality for which they paid and contracted.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule

109. Plaintiff and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that FieldTurf had misrepresented the durability of its Artificial Turf Fields and omitted material facts regarding the defective Evolution Fiber.

110. Though emails between FieldTurf employees and officers showed that FieldTurf was aware of the defective Evolution Fiber as early as 2006, and possibly earlier, FieldTurf knowingly concealed the defective Evolution Fiber from consumers and the public at large, representing and intentionally manufacturing, marketing, selling, and installing Artificial Turf Fields containing the defective Evolution Fiber, a product that fell far below what was promised through its advertisements and contracts for sale.

- 35 -

111.  Defendants' fraud was elaborate and well concealed.  Indeed, it took NJ Advance Media six months of in-depth investigation, analyzing 5,000 pages of production from 40 document requests, interviewing dozens of coaches, officials, and current and former FieldTurf employees, examining 50 fields in New Jersey, and commissioning the services of an independent testing laboratory the University of Michigan's Breaker Space Lab to test turf fibers from three locations containing the Artificial Turf Fields in New Jersey to uncover the breadth of the fraudulent scheme. Even now, requests from government officials to open federal and state investigations into the scheme are pending, which investigations could reveal even more that has yet to be discovered.

112.  Plaintiff and Class members had no realistic ability to discover the omissions or the fraudulent nature of the misrepresentations, until NJ Advance Media published the results of its thorough and time consuming investigation in December 2016.

113.  Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

## Fraudulent Concealment

114.  All applicable statutes of limitation have also been tolled by FieldTurf's knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

115.    Defendants have known of the defective Evolution Fiber since at least 2006 when they began to investigate customer complaints.  Since that time, FieldTurf has intentionally concealed from, or failed to notify, Plaintiff, the Class members, and the public of the defective Evolution Fiber and the true durability and performance of its Artificial Turf Fields.

116.    Further, there is no question that FieldTurf knowingly manufactured, marketed, sold, and installed its Artificial Turf Fields containing the defective Evolution Fiber well after it knew or had reason to know of the defective Evolution Fiber.

117.    Despite knowing about the defective Evolution Fiber since 2006, and possibly earlier, FieldTurf actively concealed it from consumers until it discontinued the Artificial Turf Fields in 2012.  Through the date of this filing, FieldTurf has not acknowledged the full extent of the problem, nor made any effort to make Plaintiff and the Class members whole.

118.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and FieldTurf's active concealment of the facts alleged herein.

### Estoppel

119.    Defendants were and are under a continuous duty to disclose to Plaintiff and Class members the true character, quality, and nature of the Artificial Turf Fields,

including the character, quality, and nature of its component fibers. Instead, FieldTurf actively concealed the true character, quality, and nature of the Artificial Turf Fields, knowingly made misrepresentations about the quality, reliability, durability, characteristics, and performance of the Artificial Turf Fields and omitted material information in its marketing and advertisements, in its contracts and warranty certificates, and in its communications with Plaintiff and Class members.

120.    Plaintiff and Class members reasonably relied upon FieldTurf's knowing and affirmative misrepresentations and/or active concealment of these facts.

121.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## CLASS ALLEGATIONS

122.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

123.    Plaintiff bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), on behalf of itself and all others similarly situated as members of the following Nationwide Class and New Jersey Subclass (collectively, the "Classes") on their respective federal and state claims.

124.    The proposed Classes are defined as:

Nationwide Class:   All persons and entities in the United States, including its territories, who purchased Artificial Turf Fields from FieldTurf or its affiliates, entities, or subsidiaries between 2005 and 2012.

New Jersey Subclass:  All persons and entities in the State of New Jersey who purchased Artificial Turf Fields from FieldTurf or its affiliates, entities, or subsidiaries between 2005 and 2012.

125.   Excluded from the Classes are Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, board members, directors, officers, employees, trustees, parents, children, heirs, assigns, subsidiaries and successors, and other persons or entities related to, or affiliated with Defendants.

126.   Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

127.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used in an individual action alleging the same claims.

128.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

129.   **Numerosity.**  Plaintiff does not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendants.   However, based on investigative news reports, pleadings, and

depositions in related cases, and FieldTurf's own website, Plaintiff believes that both the Classes encompass many hundreds and perhaps more than a thousand persons and entities whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable. Further, based on the $300,000 - $500,000 average purchase price of the Artificial Turf Field Turfs at issue and the reported significant costs of replacements, additional repairs, and other damages as enumerated herein, Plaintiff believes that the amount in controversy exceeds $5 million.

130. ***Existence and Predominance of Common Questions of Law and Fact.*** All members of the respective Classes have been subject to, and affected by, the same conduct. These claims are based on standard form contracts and uniform practices in FieldTurf's sales and marketing practices. Thus, questions of law and fact are common to members of the Classes and predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to, the following:

(a)    whether FieldTurf's Artificial Turf Fields are defective within their expected or promised lifespan;

(b)    whether FieldTurf had knowledge of the defective Evolution Fiber in its Artificial Turf Fields from 2005 through 2012 or for any portion of time thereof;

(c)      whether FieldTurf concealed the defective Evolution Fiber and true qualities of its Artificial Turf Fields, including their durability, performance, and lifespan;

(d)      whether FieldTurf actively concealed the defective Evolution Fiber and true qualities of its Artificial Turf Fields, including their durability, performance, and lifespan in order to maximize their profits to the detriment of Plaintiff and the Class members;

(e)      whether FieldTurf's omissions regarding the defective Evolution Fiber in the Artificial Turf Fields were material, intended to, and likely to deceive Plaintiff and the Class members;

(f)      whether FieldTurf had a duty to disclose material facts to Plaintiff and the Class members regarding the defective Evolution Fiber in the Artificial Turf Fields;

(g)      whether the FieldTurf had been unjustly enriched at the expense of Plaintiff and the Class members;

(h)      whether Plaintiff and the Class members are entitled to restitution, statutory, or punitive damages, disgorgement, injunction, specific performance, or other relief;

(i)      whether any applicable statute of limitations should be tolled due Plaintiff and the Class members' inability to discover the conduct and/or damages

- 41 -

complained of herein or due to FieldTurf's fraudulent concealment of the defective Evolution Fiber in the Artificial Turf Fields;

(j)    whether Field Turf should be estopped from relying on any applicable statutes of limitation; and

(k)    whether the Court can order Defendants to pay damages, what the proper measure of damages is, and also whether the Court can enter injunctive relief.

131.    All members of the Classes have been subjected to and affected by a uniform course of conduct by Defendants that was designed to increase Defendants' income, sales, and reputation through, *inter alia*:

(a)    making false misrepresentations to Plaintiff and the Class members regarding the durability and performance of its Artificial Turf Fields;

(b)    knowingly concealing the truth about the defective Evolution Fiber and its foreseeable and significant impact on true performance and durability of its Artificial Turf Fields;

(c)    selling and installing its Artificial Turf Fields with a known defect;

(d)    making no viable replacement available in a reasonable timeframe;

(e)    denying and evading valid warranty claims; and

(f)    charging premiums for field replacements due to the concealed defect.

132.   *Typicality.*   The claims of the individually named Plaintiff is typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes in that Plaintiff and the other members of the Classes were subject to the same conduct, were subject to the terms of the same agreement, and were met with the same breach of contract by Defendants.

133.   *Adequacy of Representation.*   Plaintiff will fairly and adequately represent the interests of the Classes.   Plaintiff is committed to the vigorous prosecution of the Classes' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions, including consumer protection actions.

134.   *Superiority.*   A class action is superior to other methods for the fast and efficient adjudication of this controversy.   A class action regarding the issues in this case does not create any problems of manageability.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.   The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendants.   It would thus be virtually impossible for the Classes, on an individual basis, to obtain effective redress for the wrongs done to them.   Furthermore, even if Class members could afford such individualized litigation, the court system could not.   Individualized litigation would

create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## COUNT I

### Claim for Relief for Violation of the New Jersey Consumer Fraud Act
### (N.J. STAT. ANN. §56:8-1, *et seq*.)
### on Behalf of Plaintiff and the New Jersey Subclass

135.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

136.   The New Jersey Consumer Fraud Act ("NJCFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. STAT. ANN. §56:8-2.

137.   Plaintiff, the New Jersey Subclass members, and Defendants are "persons" as defined and construed under the NJCFA, N.J. STAT. ANN. §56:8-1(d).

138.   Defendants engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. §56:8-1(c), (e), and FieldTurf's actions as set forth herein occurred in the conduct of trade or commerce.

139.   Defendants engaged in deceptive acts and practices in the form of both misrepresentations and omissions during the conduct of business in and from New Jersey in violation of the NJCFA.  Specifically, Defendants engaged in the methods, acts, practices, and conduct described in this Complaint, which constitute unconscionable commercial practices, deception, fraud, misrepresentations, and knowing concealment or omission of a material fact, as defined under the NJCFA. These methods, acts and practices include, but are not limited to: (1) representing that the Artificial Turf Field have characteristics, durability, uses, benefits, and qualities which they do not have; (2) representing that the Artificial Turf Fields are of a particular standard, quality, and grade when they are not; (3) advertising the Artificial Turf Fields with the intent not to sell them as advertised; (4) failing to disclose material information concerning the Artificial Turf Fields with the intent to induce consumers to purchase the Artificial Turf Fields; and (5) otherwise engaging in conduct likely to deceive.

140.  Defendants' conduct, as set forth herein, has been unfair in violation of the NJCFA because the acts or practices violate established public policy, and because the harm they cause greatly outweighs any benefits associated with those practices.

141.  FieldTurf intentionally and knowingly misrepresented and concealed material facts regarding the Artificial Turf Fields with intent to mislead Plaintiff and the New Jersey Subclass.

142.  FieldTurf knew or should have known that its conduct violated the NJCFA.

143.  Defendants had an ongoing duty to all FieldTurf consumers to refrain from unfair and deceptive practices under the NJCFA in the course of its business.

144.  Defendants owed Plaintiff and New Jersey Subclass members a duty to disclose, truthfully, all the facts concerning the performance, durability, and reliability of the Artificial Turf Fields because they:

(a)    possessed exclusive knowledge that they were manufacturing, selling, and distributing Artificial Turf Fields containing the defective Evolution Fiber;

(b)    intentionally concealed the foregoing from Plaintiff and New Jersey Subclass members;

(c)    intentionally installed less than 10 pounds of infill per square foot; and/or

- 46 -

(d)    made incomplete or negligent representations about the safety, performance and durability, including lifespan, of the Artificial Turf Fields while purposefully withholding material facts from Plaintiff that contradicted those representations.

145.    FieldTurf's continuing manufacture, marketing, sale, and installation of Artificial Turf Fields containing the defective Evolution Fiber and its misrepresentations and concealment of the true characteristics of the Artificial Turf Fields were material to Plaintiff and the New Jersey Subclass.

146.    Defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Plaintiff and New Jersey Subclass members, about the true performance, durability, and lifespan of the Artificial Turf Fields.

147.    Plaintiff and New Jersey Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of FieldTurf's misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the New Jersey Subclass members who purchased the Artificial Turf Fields would not have purchased them at all and/or – if the Artificial Turf Fields' true nature had been disclosed and mitigated – would have paid significantly less for them.  Plaintiff and New Jersey Subclass members also suffered diminished value of their Artificial Turf Fields, as well as lost or diminished use.

148.   As a result of the foregoing wrongful conduct of Defendants, Plaintiff and the New Jersey Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. STAT. ANN. §56:8-19, and all other just and appropriate relief.  Additionally, Defendants should be enjoined from continuing to engage in these unlawful, deceptive practices.  Through these practices, Defendants have improperly obtained and continue to improperly obtain money from Plaintiff and members of the New Jersey Subclass.

149.   Further, Defendants' unlawful and deceptive practices set forth above and throughout this Complaint were and are wanton, willful, and outrageous and manifest a reckless disregard for the consequences of Defendants' actions and for the rights of Plaintiff and the members of the New Jersey Subclass, which warrant an award of punitive damages to deter Defendants from committing such acts in the future.

## COUNT II

### Breach of Implied Warranty of Merchantability
### (N.J. STAT. ANN. §§12A:2-314 and 2A-212)
### on Behalf of Plaintiff and the New Jersey Subclass

150.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

- 48 -

151.  Defendants are and were at all relevant times "merchants" with respect to synthetic grass fields under N.J. STAT. ANN. §12A:2-104(1) and "sellers" of synthetic grass fields under §2-103(1)(d).

152.  The Artificial Turf Fields are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§12A:2-105(1) and 2A-103(1)(h).

153.  A warranty that the Artificial Turf Fields were in merchantable condition and fit for the ordinary purpose for which synthetic grass fields are used is implied by law pursuant to N.J. STAT. ANN. §§12A:2-314 and 2A-212.

154.  These Artificial Turf Fields, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which synthetic and grass fields are used.  Specifically, the Artificial Turf Fields are inherently defective in that they are manufactured with a component material that FieldTurf itself has deemed defective.  Further, any warranty repairs or replacements made with Artificial Turf Fields that contain this same defective component material were not, when the repair or replacement was made, nor at any time thereafter, in merchantable condition and are not fit for the ordinary purpose for which synthetic and grass fields are used; as such, they fail to cure FieldTurf's breach of implied warranty.

155.  FieldTurf has been on notice of these issues since at least 2006 through its own investigative efforts and numerous customer complaints, lawsuits filed against

it, including the instant Complaint, and by numerous individual letters, communications, and warranty repair and replacement requests sent by Plaintiff and other New Jersey Subclass members within a reasonable amount of time after discovering premature deterioration in their Artificial Turf Fields and/or learning of the defective Evolution Fiber.

156.   As a direct and proximate result of FieldTurf's breach of the implied warranty of merchantability, Plaintiff and the other New Jersey Subclass members have been damaged in an amount to be proven at trial.

## COUNT III

### Breach of Implied Warranty of Fitness for a Particular Purpose
### (N.J. STAT. ANN. §§12A:2-315)
### on Behalf of Plaintiff and the New Jersey Subclass

157.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

158.   Defendants are and were at all relevant times "merchants" with respect to synthetic grass fields under N.J. STAT. ANN. §12A:2-104(1) and "sellers" of synthetic grass fields under §2-103(1)(d).

159.   The Artificial Turf Fields are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§12A:2-105(1) and 2A-103(1)(h).

160.   A warranty that the Artificial Turf Fields were fit for the particular purpose for which synthetic grass fields are required, in particular as athletic playing

fields that sustain a great deal of use of wear throughout the year, is implied by law pursuant to N.J. STAT. ANN. §§12A:2-315.

161.  FieldTurf knew at the time of contracting the sale and installation of the Artificial Turf Fields that purchasers intended to use those fields as athletic fields requiring a particular standard of performance and durability.  FieldTurf further knew that purchasers could not know or understand the nuances of synthetic grass fields' component materials or design and that they were relying on the FieldTurf's skill or judgment to select or furnish suitable good.

162.  These Artificial Turf Fields, when sold and installed and at all times thereafter, were not fit for the particular purpose for which synthetic and grass fields are used as athletic turf.  Specifically, the Artificial Turf Fields are inherently defective in that they are manufactured with a component material that FieldTurf itself has deemed defective.  Further, any warranty repairs or replacements made with Artificial Turf Fields that contain this same defective component material were not, when the repair or replacement was made, nor at any time thereafter, fit for the particular purpose for which synthetic and grass fields are used as athletic turf; as such, they fail to cure FieldTurf's breach of implied warranty.

163.  FieldTurf has been on notice of these issues since at least 2006 through its own investigative efforts and numerous customer complaints, lawsuits filed against it, including the instant Complaint, and by numerous individual letters,

communications, and warranty repair and replacement requests sent by Plaintiff and other New Jersey Subclass members within a reasonable amount of time after discovering premature deterioration in their Artificial Turf Fields and/or learning of the defective Evolution Fiber.

164.   As a direct and proximate result of FieldTurf's breach of the implied warranty of merchantability, Plaintiff and the other New Jersey Subclass members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF EXPRESS WARRANTY
### (N.J. STAT. ANN. §§12A:2-313 and 2A-210)
### on Behalf of Plaintiff and the New Jersey Subclass

165.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

166.   FieldTurf is and was at all relevant times "merchants" with respect to synthetic grass fields under N.J. STAT. ANN. §12A:2-104(1) and "sellers" of synthetic grass fields under §2-103(1)(d).

167.   The Artificial Turf Fields are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§12A:2-105(1) and 2A-103(1)(h).

168.   In connection with the purchase all Artificial Turf Fields, FieldTurf provides an express warranty for eight years. This warranty exists to cover defects "in material or workmanship, resulting in premature wear, during normal and ordinary use

of the Product for the sport activities set our below or for any other uses for which FieldTurf gives its written authorization . . . ." In addition to the eight-year warranty described in FieldTurf's marketing materials and provided to Plaintiff and New Jersey Subclass members, FieldTurf also warranted and represented in the sales contracts, that the field it installed would be "free from all defects in materials and workmanship" and "free from defects in design."

169.   FieldTurf's warranties formed a basis of the bargain that was reached when Plaintiff and other New Jersey Subclass members purchased their Artificial Turf Fields manufactured with the defective Evolution Fiber.

170.   Despite the existence of an express warranty, FieldTurf failed to inform Plaintiff and New Jersey Subclass members that the Artificial Turf Fields were knowingly manufactured, marketed, sold, and installed with the Evolutions Fiber Defect, which leads to such premature deterioration, and failed to fix or replace the defective Artificial Turf Fields with synthetic grass fields that did not contain the defective Evolution Fiber.

171.   Further, Plaintiff and New Jersey Subclass members experienced premature deterioration within the warranty period.

172.   FieldTurf breached the express warranty promising to repair and replace materials defects and workmanship.  FieldTurf has not yet repaired or adjusted, and

have been unable to repair or adjust, the Artificial Turf Fields' materials defects and workmanship.

173.   Further, affording FieldTurf a reasonable opportunity to cure their breach of written warranty now would be unnecessary and futile here because upon information and belief, FieldTurf replaces defective fields with the same Artificial Turf Fields using the same Evolution Fiber. Such replacement would not and cannot cure the original defect and all consequential damages flowing therefrom.

174.   The warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other New Jersey Subclass members whole and because FieldTurf has failed and/or has refused to adequately provide an adequate replacement or remedies within a reasonable time.

175.   Accordingly, recovery by Plaintiff and the other New Jersey Subclass members is not restricted to the written warranty, and Plaintiff, individually and on behalf of the other New Jersey Subclass members, seek all remedies as allowed by law.

176.   Also, as alleged in more detail herein, at the time FieldTurf warranted and manufactured, marketed, sold, and installed the Artificial Turf Fields, it knew that the Artificial Turf Fields were inherently defective and did not conform to their warranty; further, FieldTurf had wrongfully and fraudulently concealed material facts regarding the Artificial Turf Fields.  Plaintiff and the other New Jersey Subclass

members were therefore induced to purchase or lease the Artificial Turf Fields under false and/or fraudulent pretenses.

177.   Moreover, many of the injuries flowing from the Artificial Turf Fields cannot be resolved through the limited warranty remedy, as many incidental and consequential damages have already been suffered because of FieldTurf's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other New Jersey Subclass members' remedies would be insufficient to make Plaintiff and the other New Jersey Subclass members whole.

178.   Finally, because of FieldTurf's breach of warranty as set forth herein, Plaintiff and the other New Jersey Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other New Jersey Subclass members of the purchase price of all Artificial Turf Fields currently owned, and for such other incidental and consequential damages as allowed.

179.   FieldTurf was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after FieldTurf confirmed through its own investigations that its Artificial Turf Fields contained the defective Evolution Fiber.

180.   As a direct and proximate result of FieldTurf's breach of express warranty, Plaintiff and the other New Jersey Subclass members have been damaged in an amount to be determined at trial.

## COUNT V

### Breach of Contract
### on Behalf of Plaintiff and the Nationwide Class
### (against FieldTurf USA)

181.   Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

182.   Plaintiff and members of the Nationwide Class entered into written contracts with FieldTurf USA.

183.   Plaintiff and members of the Nationwide Class formed binding and enforceable agreements when they executed written contracts and/or when they made the first required payment under their respective contracts.

184.   Plaintiff and all members of the Nationwide Class gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with FieldTurf.

185.   In exchange for such consideration, FieldTurf contracted to provide durable Artificial Turf Fields capable of providing superior performance and durability and extended wear and tear for ten plus years of performance.

186.    FieldTurf failed to perform under the contracts with Plaintiff and members of the Nationwide Class and thereby breached the contracts.

187.    As a result of FieldTurf's breach of the contracts, Plaintiff and members of the Nationwide Class suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including, but not limited to:

(a)    increased maintenance and repair costs;

(b)    early replacement costs;

(c)    premiums charged on top of warranty repairs;

(d)    loss of use and ticket sales;

(e)    deterrence from seeking other defective-free artificial turf fields;

(f)    loss of investment on taxpayer dollars used to pay the exorbitant and unjustifiable price premium for FieldTurf's Artificial Turf Fields; and/or

(g)    other damages for breach of contract.

188.    The amount of damages suffered by Plaintiff and the Nationwide Class by FieldTurf's breach of the contracts is, upon information and belief, in excess of $5 million, all in an amount to be proven at trial.

## COUNT VI

### Negligent Misrepresentation
### On Behalf of Plaintiff and the Nationwide Class

189.    Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

190.    In its marketing materials throughout the period 2005 – 2012, FieldTurf represented that its Artificial Turf Fields were of "unmatched durability" and that they would last ten years.

191.    When FieldTurf made those representations, it had ample evidence in its exclusive possession to suggest that its Artificial Turf Fields were made with a defective fiber and that as a result, they would not or could not possibly live up to its durability marketing claims, including the "10 plus year" claims.  FieldTurf failed to diligently follow up on those early reports and its officials repeatedly expressed concerns about premature deterioration until it conducted its own investigation in 2012.  Following that investigation and FieldTurf's own irrefutable confirmation that the Artificial Turf Fields were defective due to the Evolution Defect, it failed to modify its marketing claims or to warn consumers of the possibility of premature deterioration.  As such, those misrepresentations were negligent when made, both before and after FieldTurf's investigation and instigation of its 2011 lawsuit against TenCate.

192.    Because no industry standards exist for determining when an artificial turf field has prematurely deteriorated, consumers, including schools and towns, justifiably relied upon FieldTurf's representations, both in purchasing and installing the Artificial Turf Fields and afterwards, when those fields indeed began to lay flat, shred, and otherwise disintegrate well before the ten plus years promised.

193.    Plaintiff and Class members have suffered a cognizable economic loss as a consequence of their reliance on FieldTurf's representations, including, but not limited to:

(a)    increased maintenance and repair costs;

(b)    early replacement costs;

(c)    premiums charged on top of warranty repairs;

(d)    loss of use and ticket sales;

(e)    deterrence from seeking other defective-free artificial turf fields;

(f)    loss of investment on taxpayer dollars used to pay the exorbitant and unjustifiable price premium for FieldTurf's Artificial Turf Fields; and/or

(g)    other damages for negligent misrepresentation.

## COUNT VII

### Unjust Enrichment
### on Behalf of Plaintiff and the Nationwide Class

194.    Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

195. FieldTurf knowingly manufactured, marketed, sold, and installed Artificial Turf Fields containing the defective Evolution Fiber and actively concealed that defect from consumers throughout the entire time period the product was available, 2005 – 2012, and into the present.  Compounding that concealment, FieldTurf actively misrepresented the durability and performance properties of its Artificial Turf Fields, promising, *inter alia*, "a useful life longer than the 10 years" and "unmatched durability," while knowing that the product it ultimately delivered and installed would be unable to deliver on such promises.

196.  As a result, FieldTurf sold nearly 1500 Artificial Turf Fields in the United States from 2005 through 2012 for more than $570 million in revenues.

197.  This $570 million in revenue constitutes a direct benefit received from Plaintiff and Class members, which: (1) directly benefitted FieldTurf or its affiliates; and (2) was taken to the detriment of Plaintiff and Class members.

198.  FieldTurf was unjustly enriched through financial benefits in the form of increased revenues and profits that resulted when Plaintiff and Class members, including municipalities, schools, school districts, and other organizations in New Jersey and across the United States, chose to install Artificial Turf Fields that would start to prematurely deteriorate within a few years of installation.

199.  Plaintiff and Class members purchased the Artificial Turf Fields based on FieldTurf's direct representations and omissions.  Further, Plaintiff and Class

members understood that FieldTurf would profit from that purchase, either directly from Plaintiff and Class members or through FieldTurf affiliates who installed FieldTurf's artificial turf systems and were required to provide financial benefits from Plaintiff and Class members to FieldTurf.

200.   As a result, Plaintiff and the Class members have conferred a benefit on FieldTurf.

201.   FieldTurf had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

202.   By purchasing the Artificial Turf Fields, Plaintiff and the Class members expected that FieldTurf's Artificial Turf Fields would have the durability, performance, and lifespan FieldTurf promised, including that they would not prematurely deteriorate well before ten years.  The reduced lifespan of FieldTurf's artificial turf systems and premature deterioration within a few years of purchase and installation has unjustly enriched FieldTurf beyond its legal rights by resulting in profits and revenues received through deception and misrepresentation.

203.   FieldTurf will be unjustly enriched if it is allowed to retain these ill-gotten benefits, and Plaintiff and each Class member is entitled to recover the amount by which FieldTurf was unjustly enriched at their expense.

## COUNT VIII

### Common Law Fraud Under New Jersey Law
### on Behalf of Plaintiff and the New Jersey Class

204.    FieldTurf made numerous material misrepresentations to Plaintiff and Class members, concerning the safety and performance of its "revolutionary" Artificial Turf Fields.

205.    FieldTurf also failed to disclose numerous material facts concerning the failure rate of its Artificial Turf Fields, and, that FieldTurf knew that its Duraspine Turf products would not perform as intended.

206.    The representations made by Defendants were false.

207.    At the time they were made, FieldTurf knew they were false.

208.    Despite knowing that its various representations about its Artificial Turf Fields were false, FieldTurf made them in an effort to induce Plaintiff and other Class members to purchase its Artificial Turf Fields at a premium price.

209.    At the time FieldTurf made these misrepresentations, Plaintiff and other Class members were ignorant of the falsity of FieldTurf's representations and believed them to be true.

210.    Relying on these false representations, Plaintiff and other Class members were induced to and did purchase Artificial Turf Fields.

211.   Had Plaintiff known the actual facts, Plaintiff and other Class members would not have purchased Artificial Turf Fields, or, would not have paid as much for their Artificial Turf Fields.

212.   As a direct and proximate result of FieldTurf's fraud, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IX

### Fraudulent Concealment Under New Jersey Law
### on Behalf of Plaintiff and the New Jersey Class

213.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

214.   FieldTurf intentionally concealed that its Artificial Turf Fields were highly defective, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

215.   FieldTurf further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided to Plaintiff and other Class members, that the Artificial Turf Fields that it was selling had no defects, were substantially more durable than any other product on the market, or even its own products, and would perform properly.

216.   FieldTurf knew these representations were false when made.

217.   The Artificial Turf Fields purchased by Plaintiff and the other Class members were, in fact, defective, and deteriorated much faster than promised under normal conditions.

218.   FieldTurf had a duty to disclose that its Artificial Turf Fields suffer from numerous defects, because Plaintiff and the other Class members relied on FieldTurf's material representations that Artificial Turf Fields were far superior to any other artificial turf surface in existence.

219.   The aforementioned concealment was material because if it had been disclosed, Plaintiff and the other Class members would not have bought Artificial Turf Fields, or would not have bought at the prices they paid.

220.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing an artificial turf surface. FieldTurf knew or recklessly disregarded that its representations were false because it had actual knowledge that its Artificial Turf Fields suffered from numerous and significant defects which they knew would cause the Artificial Turf Fields to fall well short of FieldTurf's representations concerning Duraspine Turf products.

221.   Plaintiff and the other Class members relied on FieldTurf's reputation—along with their failure to disclose the defective nature of the Artificial Turf Fields —in purchasing their Duraspine Turf product.

222.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment for their Artificial Turf Fields. FieldTurf's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT X

### Breach of the Implied Covenant of Good Faith and Fair Dealing

223.   Plaintiff re-alleges and incorporates by reference all of the preceding allegations as if fully set forth herein.

224.   Plaintiff and Defendant had a contract by which Defendant would sell and supply an Artificial Turf Field for approximately $660,000.00.  Furthermore, Defendants provided a written warranty and other express warranties to Plaintiff, which promised that the Artificial Turf Fields were durable and would have a lifespan of at least ten years, among other warranties.

225.   Implied in the contract between Plaintiff and FieldTurf is the covenant that FieldTurf must act in good faith and deal fairly with Plaintiff in performing the terms of the contract. FieldTurf thus had a duty to ensure that their marketing and

other representations regarding the quality of the Artificial Turf Fields were not false and misleading.

226. FieldTurf knew that the marketing representations regarding the durability of the Artificial Turf Fields were false and/or exaggerated as alleged herein.

227. Nevertheless, FieldTurf continued to misrepresent the durability and life span of the Artificial Turf Fields in order to induce Plaintiff and the Class to purchase them.

228. FieldTurf's unfair misrepresentations and omissions regarding the life span and durability of the Artificial Turf Fields denied Plaintiff and the Class the right to receive the benefits of the contract which were reasonably expected, and thus FieldTurf breached the implied covenant of good faith and fair dealing. Because of FieldTurf's bad faith conduct, Plaintiff and the Class were induced into purchasing Artificial Turf Fields, costing hundreds of thousands of dollars each, which would fail or deteriorate long before their advertised and promised useful lives. In sum, Plaintiff and the Class did not receive the high quality Artificial Turf Fields for which they paid under the contract.

229. Plaintiff and Class members relied to their detriment upon the misleading assertions and conduct of FieldTurf and such reliance may be presumed based on FieldTurf's unlawful conduct and FieldTurf's superior knowledge of the defects in the Artificial Turf Fields.

## COUNT XI

### Declaratory Relief

230.    Plaintiff re-alleges and incorporates by reference all of the preceding allegations as if fully set forth herein.

231.    An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties with regard to Defendants' Artificial Turf Fields supplied and installed at Soccer Field No. 2.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.    Certification of this action as a class action, appointment of Plaintiff as the Class and Subclass representatives and the undersigned counsel as Class counsel;

B.    An order declaring the actions complained of herein to be in violation of the statutory law set forth above, including a preliminary injunction enjoining Defendants from continuing to engage in unlawful business practices as alleged herein, including from further acts in violation of the NJCFA, pending the outcome of this action;

C.    An order awarding Plaintiff and the members of the Classes compensatory damages, statutory damage and multipliers, and all other forms of monetary and non-monetary relief recoverable under state law;

D.      An order awarding Plaintiff and the members of the Classes damages, consequential damages, specific performance, and/or rescission;

E.      An order awarding Plaintiff and the members of the Classes restitution and disgorgement of profits, or other equitable relief as the Court deems proper;

F.      An order awarding Plaintiff and the members of the Classes punitive damages;

G.      An order requiring Defendants to notify Class members about defects in its Artificial Turf Fields and to provide correct information to the Classes;

H.      An award of pre-judgment and post-judgment interest;

I.      An award of costs, including, but not limited to, discretionary costs, expert fees, attorneys' fees, and expenses incurred in prosecuting this case; and

J.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a jury trial on all issues so triable.

DATED:  June 14, 2017            CARELLA, BRYNE, CECCHI,
OLSTEIN,   BRODY & ANGELLO, P.C.


*/s/ James E. Cecchi*
JAMES E. CECCHI

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com


ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
(*pro hac vice application forthcoming*)
MARK J. DEARMAN
(*pro hac vice application forthcoming*)
JASON H. ALPERSTEIN
(*pro hac vice application forthcoming*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
JENNIFER R. SCULLION
(*pro hac vice application forthcoming*)
550 Broad Street, Suite 920
Newark, NJ 07102
Telephone:  973/639-9100
973/639-9393 (fax)

MITNICK LAW OFFICE, LLC
Craig R. Mitnick, Esq
35 Kings Highway East
Second Floor East
Haddonfield, NJ 08033

Attorneys for Plaintiff and Proposed
Classes